**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| BLAKE CONYERS, LAMAR EWING, and KEVIN FLINT, on behalf of a class, | ) ) ) | |
| *Plaintiffs*, | ) ) | Case No. 1:12-cv-06144 |
| v. | ) ) | Before the Honorable John J. Tharp, Jr. |
| THE CITY OF CHICAGO, | ) ) | |
| *Defendant*. | ) ) | |

# THE CITY OF CHICAGO'S
## <u>MOTION FOR SUMMARY JUDGMENT</u>

Allan T. Slagel (ARDC No. 6198470)
Brian Weinthal (ARDC No. 6304488)
Anne L. Yonover (ARDC No. 6321766)
TAFT STETTINIUS & HOLLISTER LLP
111 East Wacker Drive
Suite 2800
Chicago, Illinois 60601
Telephone:     (312) 527-4000
Email:          aslagel@taftlaw.com
                  bweinthal@taftlaw.com
                  ayonover@taftlaw.com

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................ i

TABLE OF AUTHORITIES ....................................................................................... iii

INTRODUCTION ......................................................................................................... 1

UNCONTESTED FACTS ............................................................................................. 2

I.     CPD Notifies Arrestees of the Property Inventoried and the Location of
Instructions for Reclaiming It at the Time of Arrest ......................................... 2

II.    CPD Also Provides Written Instructions for Reclaiming Personal Property at the
Time of Arrest .................................................................................................... 3

III.   Instructions for Recovering Personal Property Appeared on CPD's Website
Throughout the Class Period ............................................................................... 4

IV.   Plaintiffs Had Access to the Information Appearing on CPD's Website
Throughout the Class Period ............................................................................... 5

V.    Plaintiffs Also Had Direct Telephonic Access to ERPS Throughout the Class
Period .................................................................................................................. 7

VI.   A Priority for ERPS Throughout the Class Period was to Reunite Arrestees with
Their Personal Property ...................................................................................... 8

VII.  The Notice and Instructions Provided by the City Resulted in Substantial
Quantities of Personal Property Being Returned to Arrestees ........................... 9

VIII. Plaintiffs Have Adduced No Evidence of Class-Wide Damages .................... 11

THE LEGAL STANDARD FOR SUMMARY JUDGMENT .................................... 11

ARGUMENT .............................................................................................................. 12

I.     Instructions for Recovering Personal Property While in Jail Were Unquestionably
"Published and Generally Available" to Plaintiffs Throughout the Class Period ........... 12

II.    The Evidence Precludes Plaintiffs From Satisfying the Elements of Their § 1983
Claim ................................................................................................................. 14

       A.    Plaintiffs Have Failed to Identify a Widespread Custom or Practice that
Allowed Their Property to be Destroyed ............................................... 15

       B.    The City's Practices Were Not the "Moving Force" Behind Plaintiffs'
Losses ..................................................................................................... 17

i

C.    Plaintiffs Cannot Show Deliberate Indifference on the Part of the City ............... 18

    1.    Plaintiffs Cannot Show Actual Knowledge of a Substantial Risk of Loss .................................................................................................... 19

    2.    Plaintiffs Cannot Show a Conscious Disregard of a Substantial Risk of Loss by Failure to Take Reasonable Measures ........................... 20

CONCLUSION .................................................................................................................. 22

## TABLE OF AUTHORITIES

**Cases**

*Anderson v. Liberty Lobby, Inc.,*
    477 U.S. 242 (1986) ........................................................................................................ 11

*Arnett v. Webster,*
    658 F.3d 742 (7th Cir. 2011) ......................................................................................... 18

*Bd. of Cty. Comm'rs of Bryan Cty., OK v. Brown,*
    520 U.S. 397 (1997) ........................................................................................................ 19

*Calhoun v. Ramsey,*
    408 F.3d 375 (7th Cir. 2005) ......................................................................................... 16

*City of Oklahoma v. Tuttle,*
    471 U.S. 808 (1985) ........................................................................................................ 16

*City of W. Covina v. Perkins,*
    525 U.S. 234 (1999) ............................................................................................... 1, 12, 14

*Connick v. Thompson,*
    563 U.S. 51 (2011) .......................................................................................................... 19

*Daniel v. Cook Cty.,*
    833 F.3d 728 (7th Cir. 2016) ............................................................................... 16, 17, 19

*Daubert v. Merrell Dow Pharm., Inc.,*
    509 U.S. 579 (1993) ........................................................................................................ 11

*Dixon v. Cook Cty.,*
    819 F.3d 343 (7th Cir. 2016) ............................................................................... 16, 17, 18

*Elizarri et al. v. Sheriff of Cook County,*
    901 F.3d 787 (7th Cir. 2018) .................................................................................. *passim*

*Kotarski v. Binks Mfg. Co.,*
    No. 92 C 0518, 1992 WL 404507 (N.D. Ill. Dec. 30, 1992) .......................................... 12

*Phelan v. Cook Cty.,*
    463 F.3d 773 (7th Cir. 2006) ......................................................................................... 16

*Scott v. Harris,*
    550 U.S. 372 (2007) ........................................................................................................ 11

*Wellman v. Faulkner,*
    715 F.2d 269 (7th Cir. 1983) ......................................................................................... 18

**Statutes**

42 U.S.C. § 1983 ................................................................................................ *passim*

765 ILCS 1030/1, et seq. ...................................................................................... 4

Chicago Municipal Code § 2-84-160 .................................................................. *passim*

**Other Authorities**

Fed. R. Civ. P. 12 ............................................................................................... 12

FED. R. CIV. P. 56 ............................................................................................... 11

## <u>INTRODUCTION</u>

The City of Chicago (the "City") hereby moves for summary judgment in this matter. Plaintiffs are a class of arrestees who were held in custody for longer than thirty (30) days, and who allege the City disposed of their unclaimed property after failing to instruct them on the available means for recovering it. Although Plaintiffs contend that an "adequate procedure" for recovering personal property while incarcerated was "neither published nor generally available" during the class period, the evidence shows that instructions for reclaiming personal property were accessible to Plaintiffs throughout the class period, and that Plaintiffs had access to these instructions during confinement. This is significant, as the Court previously declined to dismiss this case over the question of whether procedures for recovering personal property were "published, [and] generally available" to Plaintiffs under *City of W. Covina v. Perkins*, 525 U.S. 234, 241 (1999). Discovery has now resolved this question in the City's favor.

Further, Plaintiffs cannot meet the elements of their sole claim under 42 U.S.C. § 1983. The evidence adduced in this case fails to identify a widespread custom or practice that was the "moving force" behind Plaintiffs' alleged losses. At the same time, Plaintiffs are unable to point to evidence of "deliberate indifference" on the part of the City – which is a required element of their cause of action under 42 U.S.C. § 1983. Consequently, because no reasonable jury could return a verdict for Plaintiffs, the City is entitled to summary judgment, and the Court should preclude this case from proceeding to trial.

## UNCONTESTED FACTS

The facts of this case are not in dispute. Upon arrest, individuals taken into custody by CPD relinquish items of personal property not permitted in municipal detention facilities.[1] This property is inventoried, whereupon CPD provides paperwork confirming the exact items received from each arrestee. SoF ¶ 5. After approximately ninety-six (96) hours, certain personal property that cannot (by Cook County regulations) accompany an arrestee to the Cook County Jail is transferred from the location of arrest to CPD's Evidence and Recovered Property Section ("ERPS"), where it remains until recovered by its owner (or his or her designee) or disposed of. SoF ¶ 6. Section 2-84-160 of the Chicago Municipal Code provides for the disposal of arrestee property not claimed (and thus deemed "abandoned") after thirty (30) days, *see* Chicago Mun. Code § 2-84-160 (2014), although the time to disposition (by auction or destruction) is often closer to sixty (60) days. SoF ¶ 12.

## I.    CPD Notifies Arrestees of the Property Inventoried and the Location of Instructions for Reclaiming It at the Time of Arrest

Personal property collected from an arrestee is inventoried at the time of arrest and recorded on CPD Form 34.523 – copies of which are retained by CPD and provided to the arrestee. SoF ¶ 9. Each Form 34.523 bears a unique inventory number, which acts as a tracking number for the property listed on it. SoF ¶ 10. The inventory number enables an arrestee to match the property shown on his or her copy of Form 34.523 (known as "Copy 4") against the personal property reflected on the electronic copy of Form 34.523 retained by CPD. *Id.* Copy 4 of Form 34.523 is an arrestee's official "receipt" for property inventoried by CPD and advises those who have questions about reclaiming personal property to contact ERPS. SoF ¶ 11. Copy

---

[1]    The facts set forth in this motion are taken from the City's Local Rule 56.1(a)(3) Statement of Material Facts in Support of Its Motion for Summary Judgment ("SoF"), which is filed concurrently in accordance with Local Rule 56.1(a)(3) of this Court. *See* ECF No. 174. This initial citation appears at SoF ¶ 5.

4 of Form 34.523 also directs individuals to CPD's website (www.ChicagoPolice.org) for further instructions on recovering personal property. *Id.* Arrestees are permitted to retain Copy 4 among their possessions upon transfer to the Cook County Jail. SoF ¶ 15.

## II. CPD Also Provides Written Instructions for Reclaiming Personal Property at the Time of Arrest

In addition to Copy 4, CPD provided arrestees an information handout during the class period entitled "Notice to Property Owner or Claimant" (the "Notice"). SoF ¶ 13. The version of the Notice used during the class period provided the address, hours, and telephone number of ERPS, and further advised arrestees to contact ERPS if they had "any questions" about how to retrieve their inventoried property. SoF ¶ 14. Like Copy 4, the Notice directed individuals to CPD's website (www.ChicagoPolice.org) for further instructions. *Id.* The Notice also alerted those in custody to Section 2-84-160 of the Chicago Municipal Code and its provision that personal property not claimed within thirty (30) days is deemed "abandoned" and may be disposed of by CPD. *See* Chicago Mun. Code §2-84-160 (2014). Arrestees were allowed to bring both the Notice and Copy 4 with them upon transfer to the Cook County Jail. SoF ¶ 15.

Of significance to this lawsuit, the version of the Notice in effect during the class period contained the following language:

> If you are in jail or incarcerated, and your receipt is marked "Property Available for Return to Owner," you may get money returned to you by sending copies of your receipt, your photo ID and the name of the facility where you are jailed or incarcerated to: Chicago Police Department Evidence and Recovered Property Section, 1011 S. Homan Avenue, Chicago, Illinois, 60624. If the property is money, a check will be sent to you at the facility where you are jailed or incarcerated.

SoF ¶ 16. Plaintiffs attempt to rely upon the final sentence of the Notice to argue that arrestees who were incarcerated during the class period had no information (and received no instructions) on how to reclaim their non-monetary property subsequent to arrest. *See, e.g.*, Pls.' Mem. in Opp'n to Mot. to Dismiss at 11-12, ECF No. 87 (filed June 2, 2015). The "class period" in this

case runs from December 1, 2011, through December 31, 2013 (the period for which the above version of the Notice was in effect), and the class includes all arrestees who were held in custody for longer than thirty (30) days whose property was auctioned or destroyed by CPD.  *See* Mem. Op. and Order at 18, ECF No. 138 (entered Sept. 28, 2017).

### III.    Instructions for Recovering Personal Property Appeared on CPD's Website Throughout the Class Period

As noted above, both Copy 4 and the Notice directed individuals to CPD's website (www.ChicagoPolice.org) for instructions and further information on reclaiming personal property subsequent to arrest.  *See supra* at 2-4.  During the class period, the information on CPD's website was presented in English, Spanish, and Polish, and stated (in pertinent part) as follows:

> You may get your inventoried property back by following the procedures detailed below.  If you have any questions, please contact the CPD Evidence and Recovered Property Section ("ERPS") at (312) 746-6777.  ERPS is located at 1011 S. Homan Avenue, Chicago, Illinois 60624 and is open Monday through Friday (8:00 a.m. to 3:00 p.m., closed holidays).

> **Personal Property Available for Return to Owner:**

> - If your receipt is marked "Property Available for Return to Owner" you may get your property back by providing the receipt and a photo ID at ERPS.

> - If you do not contact the CPD to get your property back within 30 days of the date on your receipt, the property will be considered abandoned under Chicago Municipal Code Section 2-84-160 (click here), and the forfeiture process will begin under Illinois Law, 765 ILCS 1030/1, et seq. (click here).

> - If you are in jail or incarcerated, and your receipt is marked "Property Available for Return to Owner," you may get personal property returned to you by designating a representative in writing, pursuant to the procedures of the facility where you are jailed or incarcerated.  You must have your designated representative bring your receipt, the written authorization designating your representative and authorizing your representative to pick up your property, and a photo ID to:  Chicago Police Department Evidence and Recovered Property Section, 1011 S. Homan Avenue, Chicago, Illinois 60624 during business hours, Monday through Friday (8:00 a.m. to 3:00 p.m., closed holidays).

4

SoF ¶ 17.  The underlining in the final bullet point above appeared in the original online text, and all other information regarding ERPS and Section 2-84-160 of the Chicago Municipal Code is in accordance with what appeared in the Notice.  *Id.*  This information appeared (in this form) on CPD's website during the entire class period.  *Id.*

## IV.  Plaintiffs Had Access to the Information Appearing on CPD's Website Throughout the Class Period

The Fourth Amended Complaint alleges that arrestees transferred to the Cook County Jail were not permitted to access the internet, *see* Pls.' 4th Am. Compl. ("Compl.") ¶ 20, ECF No. 81 (filed Apr. 21, 2015), and that as a consequence, "any information on how to retrieve inventoried property that may be available at (www.ChicagoPolice.org) is neither published nor generally available to persons detained at the Cook County Jail."  *Id.* ¶ 21.  Contrary to these allegations, during the class period, arrestees had continuous and unimpeded access to the instructions for retrieving personal property that appeared on CPD's website while at the Cook County Jail.  SoF ¶¶ 21, 22, 23.

The Cook County Jail employs a sizable number of correctional rehabilitation workers (or "CRWs" – commonly referred to as "social workers") at each of its facilities.  SoF ¶ 18.  The role of a CRW is to visit inmate living units to respond to oral or written requests by inmates, and to assist inmates with grievance procedures.  *Id.*  During the class period, CRWs would visit the inmate living units of the Cook County Jail five (5) times per week, and would respond to written or oral requests from inmates for assistance.  SoF ¶ 19.  The retrieval or reclamation of personal property from an arresting agency during the class period was one of the primary support functions handled by CRWs.  SoF ¶ 20.  Such assistance has long been a near-daily occurrence, with CRWs reaching out to the various municipalities within Cook County to assist

inmates with the recovery of personal property that did not follow them to the Cook County Jail. *Id*.

CRWs are further empowered to approve inmate requests for access to the internet, which are common. SoF ¶ 21. To obtain information from the internet, an inmate submits a written request on a pre-prepared form (available in each inmate living unit) indicating what data or websites he or she would like to access. *Id*. During the class period, there was no barrier or prohibition of any kind on an inmate obtaining information available on CPD's website (www.ChicagoPolice.org), and the act of procuring this information for an inmate was a recurring function that was routinely performed by all CRWs working at the Cook County Jail. *Id*.

Inmates could also request internet information from prison law librarians. SoF ¶ 22. While not every Cook County Jail facility has a law library, each unit that does not have direct access to a law library has a routing system in place for conveying requests to prison law librarians. *Id*. In either circumstance, the process for requesting internet information from prison law librarians during the class period was the same as the process for requesting this information from CRWs. *Id*. An inmate filled out a request form identifying the data or websites he or she wished to access, whereupon that information was located and delivered to the inmate by the prison law librarian. *Id*. There was no barrier to an inmate receiving information from CPD's website during the class period, and the act of providing instructions on property recovery was a recurring task performed by prison law librarians at that time. SoF ¶ 22. Inmates were never impeded or prohibited from submitting requests for internet information (to CRWs or to prison law librarians), and could even do so from the infirmary or from solitary confinement (whereupon the request would be honored and the information delivered). SoF ¶ 23.

**V.      Plaintiffs Also Had Direct Telephonic Access to ERPS Throughout the Class Period**

Plaintiffs have asserted that detainees at the Cook County Jail are only able to make collect calls, and that because CPD units will not accept collect calls, Plaintiffs were without the ability to contact ERPS to address any confusion they experienced regarding the wording of the Notice. *See, e.g.*, Pls.' Mem. in Opp'n to Mot. to Dismiss at 6, ECF No. 92 (filed June 2, 2015). The evidence, however, establishes that during the class period, inmates could submit requests to CRWs to speak with ERPS directly. SoF ¶ 24. Where no security issues existed for the inmate concerned, such requests were approved, and the inmate would be moved to a CRW office to make a call to ERPS without having to dial collect. *Id*. Accordingly, during the class period, if a detainee wanted to speak to ERPS, all he or she had to do was submit a request to a CRW, whereupon the CRW would work with security to fulfill that request without any further obligation or impediment to the inmate. *Id*.

If the request was denied due to security concerns, the CRW could still contact ERPS on the inmate's behalf to inquire as to the status and availability of personal property subject to return. SoF ¶ 25. Indeed, if a detainee did not wish to undertake efforts to obtain information concerning the return of his or her personal property, the inmate could ask a CRW to contact ERPS on his or her behalf. *Id*. In fact, most CRWs maintained strong working relationships with ERPS during the class period due to the prevalence of such requests. *Id*. Calls to ERPS by a CRW might be for the purpose of locating or identifying a property inventory for which the detainee had lost his or her Copy 4, or might involve the identification of a family member or representative to whom ERPS was authorized to release the inmate's personal property. SoF ¶ 26. Regardless of the format of the query, Plaintiffs enjoyed telephonic access to ERPS (at no cost to them) during the class period.

**VI.  A Priority for ERPS Throughout the Class Period was to Reunite Arrestees with Their Personal Property**

During the class period (and at all times before and after), a primary goal for ERPS was to reunite arrestees with their personal property.  SoF ¶ 27.  In addition to the public-service motivations underlying this objective, the reality was that by limiting the quantity of prisoner property requiring disposal, ERPS could directly and immediately limit both the administrative burden and the associated cost of disposing of personal property.  *Id*.; *see also* Chicago Mun. Code §2-84-160 (2014).  The leadership of ERPS was thus emphatic that unit personnel take steps to make the recovery of personal property as easy and intuitive a process for arrestees as practicable.  SoF ¶ 27.

To accomplish this goal, personnel at ERPS were instructed to adopt a "customer-first" mindset when it came to returning personal property to arrestees or their personal representatives.  SoF ¶ 28.  Consistent with the information in the Notice and on CPD's website, ERPS had personnel manning its phone lines five (5) days per week from 8:00 a.m. until 3:00 p.m. to respond to questions or concerns from family members, friends, CRWs, or arrestees themselves.  *Id*.  If an arrestee or CRW called ERPS to designate a person to receive an arrestee's personal property, ERPS would record this information and allow the designated person to receive the arrestee's property upon presentation of proper identification.  SoF ¶ 29.  The same was true when arrestees wrote a letter to ERPS designating a person to receive the arrestee's property (of which ERPS received dozens in any given month).  *Id*.  In January of 2013, ERPS designated a specific individual to serve as an ombudsman for CRWs who contacted the unit for information or assistance, and even created a dedicated e-mail address to field inquiries from CRWs at the Cook County Jail.  SoF ¶ 30.

In addition, during the class period, ERPS issued department notices requesting officers to ask for the names of individuals who were authorized to recover personal property on behalf of arrestees, and to then place those names in the "Comments" section of Form 34.523. SoF ¶ 31. Furthermore, although property is deemed "abandoned" after thirty (30) days under Section 2-84-160 of the Chicago Municipal Code, *see* Chicago Mun. Code §2-84-160 (2014), the disposal of personal property often took up to sixty (60) days due to the volume of property collected, or due to delays in sending packages of property to the auction vendor. SoF ¶ 32. If an arrestee or duly designated representative made a request to recover personal property after thirty (30) days – but before the property was recorded as being disposed of or destroyed – ERPS personnel would make every attempt to find and return the property to the authorized person. *Id*. Simply put, CPD's goal was to reunite arrestees with their personal property, as efforts to return personal property reduced both the administrative burden and the overall cost of disposition to the City. SoF ¶ 27.

**VII.    The Notice and Instructions Provided by the City Resulted in Substantial Quantities of Personal Property Being Returned to Arrestees**

To receive, record, and track personal property inventories, CPD uses a computer system known as "eTrack" – which is the system responsible for generating the copies of Form 34.523 that are provided to the arrestee and retained by the City. SoF ¶ 33. The "eTrack" system populates associated databases that enable CPD officers to extract information on the status of individual personal property inventories, or to generate reports (called "Crystal Reports") on groups of personal property inventories collected over specific periods of time. *Id*. During the class period, CPD created 233,339 personal property inventories (or 233,339 unique copies of Form 34.523) on behalf of arrestees. SoF ¶ 34. Of these personal property inventories, 178,409 (or 76.5 percent) were successfully *returned* to arrestees prior to disposal. *Id*.

These figures are significant, as they demonstrate that more than *three-quarters* of all arrestee property seized by CPD was ultimately recovered by rightful owners notwithstanding the fact that arrestees often abandoned or forsook personal property seized at the time of arrest. Indeed, deposition testimony elicited from the three named-Plaintiffs shows that during prior arrests (of which there were nearly fifty (50) among them), each voluntarily relinquished or intentionally failed to recover personal property seized at the time of arrest. *See* Opp'n to Pls.' Mot. for Class Certification at 4-10, ECF No. 125 (filed Nov. 11, 2016). This was either because the monetary value of such items was "insignificant," or because the economic worth of these items was unimportant when compared to the seriousness of incarceration or pending criminal charges. SoF ¶ 35. There would certainly have been other reasons for which an arrestee might abandon his or her personal property, but the practical effect is that CPD could never achieve a 100.0 percent return-rate.

Consistent with these facts, the return-rates for arrestee property stayed uniform in the years that followed, despite edits to the written Notice that was provided to arrestees. SoF ¶¶ 36, 37. In January of 2014 – marking the end of the class period – the version of the Notice provided to arrestees was changed to reflect the language that had appeared on CPD's website throughout the class period (*i.e.*, "If you are in jail or incarcerated, and your receipt is marked "Property Available for Return to Owner," you may get *property* returned to you by . . . ."). SoF ¶ 36. However, the corresponding rate of return for prisoner property only increased to 79.7 percent for that year (a mere 3.2 percent difference). SoF ¶ 37. A modest increase followed in 2015 (to 81.6 percent), although the rate fell in 2016 to 78.8 percent without any fallback or reversion to the wording of the Notice that Plaintiffs grieve in the instant case. *Id.*

## VIII.  Plaintiffs Have Adduced No Evidence of Class-Wide Damages

In response to discovery requests, the named-Plaintiffs (now class representatives) were mostly unable to identify the precise make, model, value, or purchase date of property disposed of by the City, and were further unable to produce receipts or other proofs of purchase for any items they failed to recover.  SoF ¶ 39.  Although Plaintiffs have disclosed an expert who purports to tally specific items of personal property deemed "valuable" by Plaintiffs' counsel, this expert admits that she performed no analysis of the overall value of damages available to the class, and does not provide any means of assessing the per-item worth of supposedly "valuable" property disposed of by the City.  SoF ¶ 40.  The City has therefore filed a concurrent motion to exclude Plaintiffs' expert under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993).  *See* Mot. to Exclude the Opinions and Testimony of Melissa Gutierrez Kapheim, ECF No. 176 (filed Mar. 15, 2019).

## THE LEGAL STANDARD FOR SUMMARY JUDGMENT

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).  A genuine dispute as to any material fact only exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  In ruling on a motion for summary judgment, facts are viewed in a light most favorable to the nonmoving party "only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380 (2007).  After "a properly supported motion for summary judgment is made, the adverse party 'must set forth specific facts showing that there is a genuine issue for trial.'" *Anderson*, 477 U.S. at 255 (quotation omitted).  Such facts must be "qualitatively capable of creating a genuine issue of material to fact to avoid summary judgment." *Kotarski v. Binks Mfg. Co.*, No. 92 C 0518, 1992 WL 404507, at *1 (N.D. Ill. Dec.

30, 1992). Indeed, "[e]vidence that could *in theory* create an inference but that would not allow a *rational* finder of fact to draw that inference will not defeat summary judgment." *Id*. (emphases in original).

## ARGUMENT

During the class period, Plaintiffs had access to detailed instructions for the recovery of their personal property while incarcerated. This fact alone merits an award of summary judgment in the City's favor, as it was on this basis that Plaintiffs previously avoided dismissal. Yet even if this were not the case, Plaintiffs have failed to identify a widespread custom or practice on the part of the City that gave rise to a constitutional injury of some form. Moreover, Plaintiffs cannot show "deliberate indifference" on the part of the City, which is fatal to their claim under 42 U.S.C. § 1983. Accordingly, because no reasonable jury could return a verdict for Plaintiffs, the City is entitled to summary judgment.

**I.      Instructions for Recovering Personal Property While in Jail Were Unquestionably "Published and Generally Available" to Plaintiffs Throughout the Class Period**

In seeking to dismiss the Fourth Amended Complaint, the City relied on the holding of *City of W. Covina v. Perkins*, 525 U.S. 234 (1998), which found that due process only required municipalities to "take reasonable steps to give notice that the property has been taken so the owner can pursue available remedies for its return." *Id*. at 240. The issue in *West Covina* was whether due process required a municipality to give detailed and specific instructions or advice to owners who seek the return of property that is lawfully seized, but no longer needed for investigation or criminal prosecution. *Id*. at 236. Finding that it did not, the Supreme Court held that the type of "individualized notice" demanded by plaintiffs in that case (and in this one) was not required where notice of state-law remedies was "published, [and] generally available." *Id*. at 241. The City thus argued that this case should be dismissed under F.R.C.P. 12(b)(6), as

12

instructions for recovering personal property were both posted on CPD's website and accessible to Plaintiffs while they remained in jail. *See* Mem. in Supp. of Def.'s Mot. to Dismiss the 4th Am. Compl. at 11, ECF No. 88 (filed May 15, 2015).

In response, Plaintiffs pointed to allegations in the Fourth Amended Complaint claiming that arrestees transferred to the Cook County Jail are not permitted to access the internet, *see* Compl. ¶ 20, and that as a consequence, "any information on how to retrieve inventoried property that may be available at (www.ChicagoPolice.org) is neither published nor generally available to persons detained at the Cook County Jail." *Id.* ¶ 21. Taking these allegations as true, the Court noted that a factual dispute existed on this point, and that without proof that inmates had access to the internet, the only description of the procedures for recovering personal property that had been provided to arrestees were those appearing in the Notice (which only referred to "money" during the class period). *See* Mem. Opinion and Order at 15, ECF No. 95 (entered Feb. 10, 2016).

The undisputed evidence establishes, however, that during the class period, inmates had access to the detailed instructions for recovering personal property that appeared on CPD's website while at the Cook County Jail. To obtain this information (which was flagged in both the Notice and Copy 4), an inmate simply submitted a written request to a CRW indicating what data or websites he or she wanted to access. SoF ¶ 21. CRWs were available to inmates five (5) days per week, SoF ¶ 19, and routinely provided prisoners with information from the websites of various Cook County municipalities (including Chicago) regarding the processes for recovering personal property subsequent to arrest. SoF ¶ 20. This was a recurring function performed by all CRWs who worked at the Cook County Jail during the class period. SoF ¶ 21.

Prisoners had the further option of requesting this information from prison law librarians – who also performed this function. SoF ¶ 22. To invoke the assistance of a prison law librarian, a detainee merely filled out a request form identifying the data or websites he or she wished to access, whereupon that information (if appropriate) was located and delivered to the inmate by the prison law librarian. *Id.* It is undisputed that inmates were allowed to submit such requests during the class period, and could even do so from the infirmary or from solitary confinement. SoF ¶ 23. As with CRWs, the delivery of the information and instructions appearing on CPD's website was a recurrent function performed by all prison law librarians who worked at the Cook County Jail. SoF ¶ 22.

Plaintiffs thus had access to the instructions for recovering personal property that appeared on CPD's website while they were confined. These instructions were detailed and specific – enumerating not only the steps that arrestees needed to take to reclaim their personal property, but also the exact times and location at which class members' personal representatives could obtain these items on their behalves. *See supra* at 4-5. As such, the process for recovering personal property from the City while in jail was both published and generally available to Plaintiffs throughout the class period. As such, under the holding of *West Covina*, the City is entitled to summary judgment, as any prior question on the availability of recovery information is no longer in dispute. *See West Covina*, 525 U.S. at 241.

## II. The Evidence Precludes Plaintiffs From Satisfying the Elements of Their § 1983 Claim

If this case were to proceed to trial, the proposed jury instructions would likely mirror those given in *Elizarri et al. v. Sheriff of Cook County* – a class action lawsuit brought by Plaintiffs' counsel under 42 U.S.C. § 1983 and tried in February of 2016. *See Elizarri*, 901 F.3d 787, 788 (7th Cir. 2018). In *Elizarri*, the plaintiffs attempted to ascribe *Monell* liability to the

Sheriff of Cook County by alleging that their constitutional rights had been violated by the Sheriff's failure to prevent the loss of personal property retained by the Cook County Jail during confinement. *See id*. at 789. Although the plaintiffs argued the Sheriff had a constitutional obligation to curb excessive rates of property loss, a jury returned a verdict in favor of the Sheriff, finding that loss rates – even though substantial – had been falling due to the implementation of added controls. *See id*. at 789-90. Plaintiffs in *Elizarri* appealed, whereupon the Seventh Circuit affirmed the jury verdict. *See id*. at 792.

The Seventh Circuit held that the trial judge had correctly instructed the jury on the question of the Sheriff's liability under § 1983. *See id*. at 790. At trial, the jury was told that the Sheriff could be found liable only if:

1.  There was a widespread custom or practice which allowed the plaintiffs' property to be lost or stolen;

2.  The custom or practice was the "moving force" behind the plaintiffs' losses; and

3.  The defendant was deliberately indifferent to plaintiffs' losses.

*Id*. These instructions were taken from the Federal Civil Pattern Jury Instructions of the Seventh Circuit, *see* http://www.ca7.uscourts.gov/pattern-jury-instructions/pattern-jury.htm, and are either similar or identical to the instructions the Court would likely give if this case was to proceed to trial. However, as explained below, the evidence adduced during discovery precludes Plaintiffs from satisfying any element of their § 1983 claim.

### A. Plaintiffs Have Failed to Identify a Widespread Custom or Practice that Allowed Their Property to be Destroyed

In response to the City's motion to dismiss the Fourth Amended Complaint, Plaintiffs' theory of the case was that because the Notice failed to advise class members of any available means to recover their personal property while in jail, the blame or fault for the disposal of class

members' personal property rested with the City, and this omission was sufficient to assign *Monell* liability to the City under § 1983. This theory has unraveled. Indeed, the evidence shows that throughout the class period, instructions for recovering personal property while in jail were posted on CPD's website, and Plaintiffs had multiple options for accessing and viewing this information at the Cook County Jail. *See supra* at 4-7. No reasonable argument can be made, therefore, that an omission even occurred on the part of the City, and Plaintiffs have failed to identify any other custom or practice that somehow led to the disposal of their property.

Even if Plaintiffs argue that some other custom or practice somehow allowed the disposal of their property, the evidence negates any suggestion that such custom or practice was "widespread." To hold the City liable under § 1983 and *Monell*, Plaintiffs must first prove that an unlawful practice "was so pervasive that acquiescence on the part of policymakers was apparent and amounted to a policy decision." *Daniel v. Cook Cty.*, 833 F.3d 728, 734 (7th Cir. 2016) (quoting *Phelan v. Cook Cty.*, 463 F.3d 773, 790 (7th Cir. 2006) (citation omitted)). In the omissions context, the Seventh Circuit has found that acts of omission must typically represent "systemic and gross deficiencies." *Daniel*, 833 F.3d at 735 (quoting *Dixon v. Cook Cty.*, 819 F.3d 343, 348 (7th Cir. 2016)). In fact, "where the policy relied upon is not itself unconstitutional, considerably more proof than the single incident will be necessary in every case to establish both the requisite fault on the part of the municipality and the causal connection between the [omission in the policy] and the constitutional deprivation." *Calhoun v. Ramsey*, 408 F.3d 375, 380 (7th Cir. 2005) (quoting *City of Oklahoma v. Tuttle*, 471 U.S. 808, 824 (1985) (footnote omitted)).

The return-rates for personal property show that if there was any "widespread" custom or practice, it was that of reuniting arrestees with their personal property. During the class period,

the City created 233,339 personal property inventories, of which 178,409 (76.5 percent) were successfully *returned* to arrestees prior to auction or destruction. SoF ¶ 34. These numbers stayed consistent in the years that followed, hovering between 79.7 percent and 81.6 percent even upon revision of the Notice. SoF ¶ 37. This regularity is consistent with the City's prior arguments that some number of arrestees (epitomized by the named-Plaintiffs) regularly abandoned or intentionally failed to recover personal property seized at the time of arrest. *See* Opp'n to Pls.' Mot. for Class Certification at 4-10, ECF No. 125 (filed Nov. 11, 2016). In any case, the rate at which personal property was disposed of during the class period (23.5 percent) does not give rise to a "widespread" or "systemic" practice, and is not sufficient to serve as a true constitutional injury for the purposes of § 1983 or *Monell*. *See Daniel*, 833 F.3d at 734.

**B.      The City's Practices Were Not the "Moving Force" Behind Plaintiffs' Losses**

To establish liability under § 1983, Plaintiffs must show that a custom or practice of the City was the "moving force" behind their constitutional injuries. *Dixon*, 819 F.3d at 848. "A custom or practice is a moving force behind a constitutional violation if the custom or practice was the direct cause of the loss." *Elizarri*, 901 F.3d at 790 (quoting the underlying jury instruction given by the trial court). Plaintiffs had previously asserted that because the Notice failed to advise class members of any available means to recover their personal property while in jail, the lack of any further information or guidance on this subject ultimately resulted in this property being destroyed with Plaintiffs believing they had no available means of reclaiming it. As noted above, this theory of the case has now collapsed, as discovery has shown that instructions for recovering personal property while in jail were posted on CPD's website, and that Plaintiffs had multiple options for accessing and viewing this information at the Cook County Jail. *See supra* at 4-7.

17

In response, Plaintiffs may attempt to argue that upon reading the Notice, members of the class concluded that there was no means of recovering personal property while in jail, and thus assumed that consulting CPD's website (or just calling ERPS) was either futile or unnecessary. But this argument also fails. Both the Notice and Copy 4 alerted arrestees to the existence of Section 2-84-160 of the Chicago Municipal Code, which provides for the disposal of arrestee property that is not claimed within thirty (30) days. *See* Chicago Mun. Code § 2-84-160 (2014). Class members had access to this statute via the prison law library system. SoF ¶ 22. As such, there is no dispute that each arrestee was aware that he or she had thirty (30) days to recover personal property subsequent to arrest (and prior to disposition). The "moving force" behind the auction or destruction of Plaintiffs' property, therefore, was not a custom or practice of the City, but rather Plaintiffs' reluctance to consult a CRW, a prison law librarian, ERPS, or CPD's website for information prior to the acknowledged expiration of the period for reclaiming such property under Section 2-84-160 of the Chicago Municipal Code.

## C. Plaintiffs Cannot Show Deliberate Indifference on the Part of the City

The final element Plaintiffs would need to prove under § 1983 is that policy-making officials at the City were aware of losses incurred by Plaintiffs as the result of "systemic and gross deficiencies," and yet took no action to correct them (a premise known as "deliberate indifference"). *Dixon*, 819 F.3d at 348 (citing *Wellman v. Faulkner*, 715 F.2d 269, 272 (7th Cir. 1983) (further citation omitted)). To prevail on the question of "deliberate indifference," Plaintiffs would need to establish: (1) that the City actually knew of a substantial risk that the notification procedures in effect would cause a loss of Plaintiffs' property; and (2) that the City consciously disregarded this risk by failing to take reasonable measures to prevent such losses. *See Elizarri*, 901 F.3d at 790. Negligence is not sufficient to show deliberate indifference. *See Arnett v. Webster*, 658 F.3d 742, 751 (7th Cir. 2011) (deliberate indifference "is more than

18

negligence"). In fact – using the Cook County Jail as an example – the Seventh Circuit has previously warned of the difficulties of distinguishing between mere negligence and deliberate indifference in the case of large institutions:

> In any large institution, and the Cook County Jail is very large (9,000 inmates at a time), one would expect some instances of poor health care caused by errors in scheduling and recordkeeping. Yet at the same time, such instances are to be expected by both courts and correctional officials, whose jobs include the responsibility to design and implement systems to minimize such errors. *The challenge in litigation like this is to distinguish between systemic problems showing official deliberate indifference and occasional lapses that are inevitable even in well-run institutions.*

*Daniel*, 833 F.3d at 734 (emphasis added).

In the instant case, the return-rates for arrestee property and the emphasis placed by the City on reuniting arrestees with their personal property make it impossible for Plaintiffs to satisfy either prong of the deliberate indifference test. *See Bd. of Cty. Comm'rs of Bryan Cty., OK v. Brown*, 520 U.S. 397, 410 (1997) (noting that deliberate indifference is a "stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence"). Moreover, there is no evidence that policymakers were aware of any deficiencies associated with the Notice. *See id.* The ultimate decision to revise the Notice (thus ending the class period) also suggests that the City was constantly endeavoring to correct and improve its processes for reuniting arrestees with their personal property. *See Connick v. Thompson*, 563 U.S. 51, 61-62 (2011) (observing that steps taken to address a particular omission may refute the existence of a "policy of inaction" that leads to constitutional violations).

### 1. Plaintiffs Cannot Show Actual Knowledge of a Substantial Risk of Loss

During the class period, the return-rate for personal property seized at the time of arrest (76.5 percent) was such that more than three-quarters of all arrestee property inventoried by CPD was successfully recovered by rightful owners. SoF ¶ 34. This return-rate stayed fairly

19

consistent in the years that followed – even subsequent to the revision of the version of the Notice that Plaintiffs grieve in this lawsuit. SoF ¶ 37. City policymakers would thus have had no reason to believe that any class member was at a "substantial risk" of losing his or her personal property during the class period, as only 23.5 percent of all arrestee property collected by CPD was ultimately auctioned or destroyed. SoF ¶ 34. There is also no evidence that the City received or was otherwise made aware of recurring or systemic complaints that arrestees were having difficulty recovering their personal property based on the notifications and instructions that were in place at that time. Consequently, based on the available evidence, Plaintiffs cannot show that City policymakers were aware of a "substantial risk of loss" for the purpose of showing deliberate indifference. *See Elizarri*, 901 F.3d at 790.

### 2. Plaintiffs Cannot Show a Conscious Disregard of a Substantial Risk of Loss by Failure to Take Reasonable Measures

Plaintiffs are similarly unable to show a conscious disregard of a substantial risk of loss on the part of the City based on the failure to take reasonable measures to prevent the loss. *See id*. As described above, during the class period, the primary goal for ERPS was to reunite arrestees with their personal property. SoF ¶ 27. This limited the quantity of personal property that needed to be disposed of, which in turn reduced both the administrative burden and the associated cost of disposing of personal property that was ultimately deemed "abandoned" under Section 2-84-160 of the Chicago Municipal Code. *Id*. The leadership of ERPS was therefore insistent during the class period that ERPS personnel take steps to make the recovery of personal property both easy and intuitive for arrestees (whether confined or otherwise). *Id*.

To do this, ERPS adopted a "customer-first" mindset when it came to reuniting arrestees or their representatives with personal property. SoF ¶ 28. ERPS had personnel manning its phone lines five (5) days per week from 8:00 a.m. until 3:00 p.m. to respond to questions or

concerns from family members, friends, CRWs, or arrestees themselves. *Id.* If an arrestee or CRW called ERPS to designate a party to receive his or her personal property, ERPS would catalogue this information and then allow the pick-up to occur upon presentation of proper identification. SoF ¶ 29. The same was true when arrestees contacted ERPS and made such designations by letter. *Id.* Taking these protections one step further, in January of 2013, ERPS designated a specific individual to serve as an ombudsman for CRWs who contacted the unit for information or assistance, and even created a dedicated e-mail address to field inquiries from CRWs at the Cook County Jail. SoF ¶ 30.

CPD also took further steps to ensure the return of personal property to arrestees or their representatives. During the class period, ERPS issued department notices requesting officers to ask for the names of individuals who were authorized to recover personal property on behalf of arrestees, and to then place those names in the "Comments" section of Form 34.523. SoF ¶ 31. In addition, although property was deemed "abandoned" after thirty (30) days, *see* Chicago Mun. Code §2-84-160 (2014), the auction or disposition of personal property often took up to sixty (60) days. SoF ¶ 32. If an arrestee or duly designated representative made a request to recover personal property after thirty (30) days – but before the point of disposition – ERPS personnel would make every effort to find and return that personal property to the authorized party. *Id.*

In all instances, the goal was to reunite arrestees with their personal property, and the City has retained a police procedures expert (Dr. Jon Shane, Ph.D.) to confirm and opine that the processes used by the City to return personal property to arrestees were industry-leading practices among law enforcement agencies at that time. SoF ¶ 38. Dr. Shane will testify (if necessary) that the policies and practices employed by CPD during the class period were similar to those of other large and midsized U.S. police departments at the time, and represented

customary and recognized practices for inventorying and releasing the personal property of arrestees. *Id*. There is thus no evidence demonstrating that the City displayed a conscious disregard of a substantial risk of loss of the property at issue for the purpose of showing deliberate indifference.

<u>**CONCLUSION**</u>

During the class period, Plaintiffs had access to instructions on how to recover their personal property while in jail. This alone justifies an award of summary judgment. But even if the Court were to further consider the merits of this case, the evidence is such that no reasonable jury could find that Plaintiffs had satisfied the elements of their claim under 42 U.S.C. § 1983. Plaintiffs are unable to identify a "widespread" custom or practice that was the "moving force" behind a constitutional injury, and cannot show deliberate indifference on the part of the City. Accordingly, the City respectfully requests the Court to grant summary judgment in its favor.

Dated: March 15, 2019

Respectfully submitted,

**THE CITY OF CHICAGO**

By:   s/ Brian Weinthal
_____
One of Its Attorneys

Allan T. Slagel (ARDC No. 6198470)
Brian Weinthal (ARDC No. 6304488)
Anne L. Yonover (ARDC No. 6321766)
TAFT STETTINIUS & HOLLISTER LLP
111 East Wacker Drive, Suite 2800
Chicago, Illinois 60601
Telephone:   (312) 836-4074
Email:   aslagel@taftlaw.com
  bweinthal@taftlaw.com
  ayonover@taftlaw.com

24004069.4