## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| BLAKE CONYERS, LAMAR EWING, and KEVIN FLINT, individually and for a class, | ) ) ) ) | |
| Plaintiffs, | ) ) | No. 12-CV-06144 |
| v. | ) ) | Judge John J. Tharp, Jr. |
| CITY OF CHICAGO, | ) ) | |
| Defendant. | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Plaintiffs Blake Conyers, Lamar Ewing, and Kevin Flint, individually and on behalf of a class, bring claims under 42 U.S.C. § 1983 against the City of Chicago ("City"). The plaintiffs allege that the City's policies pertaining to the destruction of personal property seized from arrestees at the City's police stations violate the Due Process Clause of the Fourteenth Amendment. Before the Court are the City's motion for summary judgment, Def.'s Mot. for Summ. J. ("City's MSJ"), ECF No. 173, the plaintiffs' motion for partial summary judgment, Pls.' Mot. for Partial Summ. J. ("Plaintiffs' MPSJ"), ECF No. 180, the plaintiffs' motion for reconsideration, Pls.' Mot. for Recons., ECF No. 201, and the City's motion to exclude the opinion and testimony of the plaintiffs' expert witness, Def.'s Mot. to Exclude the Op. and Test. of Melissa Gutierrez Kapheim, ECF No. 176. For the reasons stated below, the City's motion for summary judgment is granted, the plaintiffs' motions for partial summary judgment and reconsideration are denied, and the City's motion to exclude is denied as moot.

## BACKGROUND

When an individual is arrested in Chicago, the City requires its police officers to seize all property in that person's possession. Pls.' Local Rule 56.1 Statement ("Pls.' Statement") ¶ 3, ECF

No. 182. If the arrestee is transferred to the custody of the Cook County Sheriff, City policy dictates that only certain categories of property—outer garments, U.S. currency totaling less than $500, one plain metal ring with no stones, government-issued identification cards, prescription eyeglasses and medications, shoelaces and belts, keys, court documents and Chicago Police Department ("CPD") eTrack receipts, and credit and debit cards—accompany the individual to Cook County Jail. *Id.* ¶ 5. The City retains and inventories all other personal property. If no one claims the inventoried property within 30 days of the arrest, the City's policy has been to treat the property as abandoned and either destroy it or sell it at auction. *Id.* ¶ 14.

From December 1, 2011 until December 31, 2013, the City's policy directed employees to provide a written Notice to Property Owner or Claimant ("Notice") to any arrestee who had property seized. The Notice stated in part:

> You may get inventoried property back by following the procedures detailed below. Information on how to get back inventoried property is also available at www.ChicagoPolice.org. If you have any questions, please contact the CPD Evidence and Recovered Property Section ("ERPS") at (312) 746-6777. ERPS is located at 1011 S. Homan Avenue, Chicago, Illinois 60624 and is open Monday through Friday (8:00a.m. to 3:00p.m., closed holidays).

> **Property Available for Return to Owner:**
> If your receipt is marked "Property Available for Return to Owner" you may get your property back by providing the receipt and a photo ID at ERPS. If you do not contact the CPD to get your property back within 30 days of the date on this receipt it will be considered abandoned under Chicago Municipal Code Section 2-84-160 and the forfeiture process will begin under Illinois Law, 765 ILCS 103/1, et seq.

> If you are in jail or incarcerated, and your receipt is marked "Property Available for Return to Owner," you may get money returned to you by sending copies of your receipt, your photo ID and the name of the facility where you are jailed or incarcerated to: Chicago Police Department Evidence and Recovered Property Section; 1011 S. Homan Avenue, Chicago, Illinois, 60624. If the property is money a check will be sent to you at the facility where you are jailed or incarcerated.

Ex. 5 to *id.* City policy also dictated that every arrestee with inventoried property was to receive a CPD Form 34.523, an itemized receipt also known as a "Copy 4." City's Local Rule 56.1(a)(3) Statement ("City's Statement") Ex. D, ECF No. 174.

Plaintiff Conyers was arrested on or about February 26, 2012, while in lawful possession of an earring, a bracelet and two cell phones. Upon Conyers's transfer to Cook County Jail, the City retained these items and subsequently destroyed them after they went unclaimed for 30 days. Plaintiff Ewing was arrested on or about December 20, 2012, while in lawful possession of a brown wallet, a debit card, a library card, and two cell phones. The City retained these items upon Ewing's transfer to Cook County Jail and destroyed them after they went unclaimed for 30 days. Plaintiff Flint was arrested on or about January 1, 2013, while in lawful possession of a cell phone and a ring. The City retained and inventoried the property before destroying it or selling it at auction after no one claimed it for thirty days.

The plaintiffs subsequently filed suit against the City and alleged violations of the Fourth, Fifth, and Fourteenth Amendments. In granting the City's motion to dismiss the Third Amended Complaint, the Court dismissed the Fourth Amendment claims with prejudice. Mem. Op. and Order, ECF No. 80. The Court later granted in part and denied in part the City's motion to dismiss the Fourth Amended Complaint ("FAC," ECF No. 81); the Court dismissed the Fifth Amendment claims without prejudice pending exhaustion of state remedies but allowed the Fourteenth Amendment claims to proceed. Mem. Op. and Order, ECF No. 95. In the FAC, the plaintiffs put forth a new Fourteenth Amendment theory in which they argued that the City's policy of destroying or selling unclaimed property was not a publicly available policy (*e.g.*, dictated by statute), and thus the City was required to give individualized notice sufficient to satisfy due process. The Court agreed with the plaintiffs' statement of law, explaining that while due process

does not mandate individualized notice of state law remedies when they are publicly available, *see City of W. Covina v. Perkins*, 525 U.S. 234 (1999), such notice is required when the policies are not generally available to the public. *See Gates v. City of Chicago*, 623 F.3d 389 (7th Cir. 2010).

The plaintiffs then argued that both the Notice and Copy 4 only referred to monetary property and thus did not provide any notice as to the procedures required to reclaim non-monetary items. The City countered that both the Notice and the Copy 4 referred the reader to the CPD website, where there was full documentation of the relevant policy. The parties disputed, and continue now to dispute, whether the plaintiffs could use the internet at Cook County Jail to access the website, and also whether the webpage to which arrestees were directed by the City had been active during the relevant class period of December 1, 2011 to December 31, 2013.[1] The Court, taking this factual dispute into account, ruled that the FAC adequately alleged a due process claim:

> Here, too, the City's procedures for recovering inmate property were controlled by an internal City procedure and not by a state statute readily available to the public. As in *Gates*, *West Co*[]*vina* is therefore inapposite. The question that remains is whether the City provided notice of that procedure to the point of satisfying due process. As the Court explained in its prior opinion, the notice provided to incarcerated individuals did not explain how to obtain the return of non-monetary personal property so, standing alone, it is insufficient. In response, the City indicates they provided information on how to recover seized inmate property on the Chicago Police Department website. Though there is reason to doubt that the information available on the web was readily available to detainees, ultimately that is a factual matter disputed by the parties.

Mem. Op. and Order 14-15, ECF No. 95.

After conducting discovery geared toward that factual dispute, the parties filed dueling motions for summary judgment, the plaintiffs filed a motion to reconsider the previous dismissal

---

[1] The Court also later granted the plaintiffs' motion for class certification. Mem. Op. and Order, ECF No. 138.

of their Fifth Amendment claim, and the City filed a motion to exclude the plaintiffs' expert. The Court will address each motion in turn.

## DISCUSSION

### I. The Procedural Due Process Claim

Generally speaking, courts grant summary judgment for the moving party when "there is no genuine dispute as to any material fact" and those undisputed facts entitle the moving party to judgment as a matter of law. Fed. R. Civ. P. 56(a). For nonmoving parties to prevail, they must "set forth specific facts showing that there is a genuine issue for trial." *Ptasznik v. St. Joseph Hosp.*, 464 F.3d 691, 694 (7th Cir. 2006) (internal citations omitted). A mere "scintilla" of evidence in nonmoving parties' favor is insufficient, as they must demonstrate that there is enough evidence to support a favorable jury verdict. *Id.* Here, both sides have moved for summary judgment on the plaintiffs' due process claim. "Cross motions must be evaluated together, and the court may not grant summary judgement for either side unless the admissible evidence as a whole—from both motions—establishes that no material facts are in dispute." *Bloodworth v. Village of Greendale*, 475 Fed. App'x 92, 95 (7th Cir. 2012).

Because during the class period neither the Notice nor the Copy 4 included information on its face about the procedures for reclaiming non-monetary property, the City's motion for summary judgment hinges on the key issue of whether the plaintiffs and class members had access to a set of more complete instructions that the City claims were on the CPD website during the class period. As a result of the class certification defining the class as those incarcerated for at least 30 days following their arrest between December 1, 2011, and December 31, 2013, analysis of the website can be distilled down to three major questions: (1) does the content of the website satisfy the City's due process obligations? (2) did Cook County Jail inmates have access to the internet during the class period? (3) if Cook County Jail inmates did have access, has the City sufficiently

established that the webpage was active and online during the class period? If all three questions

can be answered affirmatively without any genuine dispute of material fact, then the City has

adequately provided notice of its procedures per *Gates*.

With respect to the first issue, the additional instructions referred to by the City provide

specific and detailed notice of the procedures in place. The webpage reads, in part:

> You may get your inventoried property back by following the procedures detailed
> below. If you have any questions, please contact the CPD Evidence and
> Recovered Property Section ("ERPS") at (312) 746-6777. ERPS is located at
> 1011 S. Homan Avenue, Chicago, Illinois 60624 and is open Monday through
> Friday (8:00 a.m. to 3:00 p.m., closed holidays).
>
> **Personal Property Available for Return to Owner:**
>
> - If your receipt is marked "Property Available for Return to Owner" you
>   may get your property back by providing the receipt and a photo ID at
>   ERPS.
> - If you do not contact the CPD to get your property back within 30 days of
>   the date on your receipt, the property will be considered abandoned under
>   Chicago Municipal Code Section 2-84-160 (click here), and the forfeiture
>   process will begin under Illinois Law, 765 ILCS 1030/1, et seq. (click
>   here).
> - If you are in jail or incarcerated, and your receipt is marked "Property
>   Available for Return to Owner," you may get personal property returned
>   to you by designating a representative in writing, pursuant to the
>   procedures of the facility where you are jailed or incarcerated. You must
>   have your designated representative bring your receipt, the written
>   authorization designating your representative and authorizing your
>   representative to pick up your property, and a photo ID to: Chicago Police
>   Department Evidence and Recovered Property Section, 1011 S. Homan
>   Avenue, Chicago, Illinois 60624 during business hours, Monday through
>   Friday (8:00 a.m. to 3:00 p.m., closed holidays).

City's Statement Ex. F 1. These instructions, which unlike the Notice and Copy 4, are not limited

to monetary property, make clear that property that goes unclaimed for 30 days will be forfeited.

They detail both the general reclaiming procedure for owners who can appear at the ERPS in

person and also the specific steps required for property owners who are currently incarcerated. The

webpage also provides specific contact information to allow readers to reach the ERPS by phone.

In short, this notice, if available to the plaintiffs during the class period, satisfies the City's notice requirements—a conclusion that even the plaintiffs do not contest. Instead, the plaintiffs focus on perceived shortcomings of the second and third issues: was internet access available to detainees at the Jail and was this webpage available during the relevant period?

To address the second issue of website access, the City argues that social workers at Cook County Jail, known as Correctional Rehabilitation Workers ("CRWs"), played a crucial role in inmates' ability to reclaim their property. The City asserts that CRWs commonly served as intermediaries between the inmates and the agencies, including the CPD, that were in possession of the individuals' property. City's MSJ 5. Furthermore, the City states that CRWs during the class period were authorized to retrieve (and commonly did retrieve) online information for inmates who had submitted written requests. *Id.* at 6. According to the City, the law librarians at Cook County Jail also performed a similar function and served as an additional avenue to retrieve information from the internet. The City concludes, therefore, that the plaintiffs could have used the assistance of either the CRWs or the law librarians to access the website in question. Inmates could also, per the City, submit requests to the CRWs to contact the ERPS directly by telephone if they had any lingering questions or concerns. *Id.* at 7. Depending on the inmate's security clearance, CRWs could either facilitate a phone call in which the inmate spoke directly to the ERPS without having to dial collect,[2] or could contact the ERPS on the inmate's behalf and relay any questions or concerns. *Id.*

In response to these assertions, the plaintiffs offer nothing but conclusory and unsupported statements. For instance, the plaintiffs claim that the CRWs' function as an internet resource was merely "theoretical," and not something that actually occurred at the Jail. Pls.' Mem. in Opp'n to

---

[2] CPD units do not accept collect calls.

Def.'s Mot. for Summ. J. 13, ECF No. 190. They ground this argument by referring to the deposition of John Mueller, the Cook County Deputy Director of Inmate Services during the class period, which they summarize in part by explaining that Mueller "stated that he could not recall any instance in which a correctional rehabilitation worker had provided information from the CPD website to a detainee." *Id.* This summary, however, is misleading. The complete question and answer cited by the plaintiffs reads as follows:

> Q. Do you know -- let me ask you this: Is that something you had ever done back when you were an actual social worker on the ground?
>
> A. I can't remember for that time period, but the honest situation regarding this is that the releasing of property and the assistance of obtaining CPD-held property is a very natural, common occurrence at the jail that they wouldn't necessarily refer to this or need to refer it for direction on how to do it. We have regular contact with ERPS to achieve what needs to be done to release the property so we don't -- even though we had access to it, we wouldn't necessarily need to refer to it for a procedure.
>
> Q. Let me ask you this which is, as a supervisor would there be any concerns that you would have with regard to one of your CRWs getting information from Chicago police on the web and providing it to an inmate?
>
> A. No, not at all.
>
> Q. This is a practice that's performed by all the CRWs you supervise, correct?
>
> A. Correct.

City's Statement Ex. G 25-26. The full context of the question and response make clear that Mueller's inability to remember referred to his own time working as a CRW more than 15 years prior (from 1994 to 2003), before he had been promoted to deputy director. Reply in Support of the City of Chicago's Mot. for Summ. J. 11-12, ECF No. 192. The answer plainly does not, as the plaintiffs assert, indicate that Mueller could not remember a single example of a CRW providing CPD website information to a Cook County Inmate. In fact, his full response illustrates just how routinely—and non-theoretically— CRWs perform the task described by the City.

The plaintiffs also claim that the City's position that CRWs freely facilitated internet access for inmates at the Jail "disregards the contrary deposition testimony of plaintiff Conyers." Pls.' Mem. in Opp'n to Def.'s Mot. for Summ. J. 13. The plaintiffs imply that because Mr. Conyers declared "without hesitation" that he "never had access" to the website, the CRW-assisted internet access procedure described by the City must not have existed in actuality. *Id.* Once again, the plaintiffs take the statement out of context. The complete exchange in Conyers's deposition is as follows:

> Q. Mr. Conyers, either before or after you were arrested on February 26th of 2012, had you ever gone to the Chicago Police website to see if there was information there about getting personal property back?
>
> A. I never had access.
>
> Q. Now, I'm not talking about when you were in jail, sir. I'm talking before you were arrested, did you ever go to that website?
>
> A. No
>
> Q: And after you were released from jail, did you ever go to that website to look for information?
>
> A: No.
>
> Q. Till this day, have you ever gone to the website to look for information?
>
> A. No.
>
> Q. I presume that you have never directed someone to go to the website to look for information for you; is that right?
>
> A. That's right, I didn't.

The City of Chicago's Opp'n to Pls.' Mot. for Class Certification Ex. E 24:20-25:17, ECF No. 125. The plaintiffs read Mr. Conyers's testimony to indicate that he never had access to the website while incarcerated at Cook County Jail, but the line of questioning was focused not on what actions Mr. Conyers took while in custody, but rather on whether he had sought information about property

return procedures either before or after he was in custody at the Jail—in other words, only time periods when he was ***not*** incarcerated. Mr. Conyers's statement, therefore, fails to establish that he never sought information about Chicago's property return procedures while in custody at the Jail.

In any event, this exchange does nothing to bolster the plaintiffs' case even if Mr. Conyers had, in fact, been referring to the period he was in custody at the Jail. That Conyers "never had access" does not tell us whether information about Chicago's property return procedures were, or were not, generally available to arrestees at the Jail. It does not tell us that Conyers tried unsuccessfully to access the site and obtain the property return instructions, much less contest that assistance with property return issues was not available in the manner that the City's evidence suggests. Indeed, it does not even establish that Ewing and Flint were similarly unable to access the site. Conyers' bare statement, even if describing his term of incarceration at the Jail, falls far short of establishing a material fact dispute about the availability of access to the City's property return procedures at the Jail. Because the plaintiffs offer no other meaningful evidence to oppose the City's claims—not even an affidavit from Conyers disputing the City's evidence that the City's procedures were generally available to arrestees at the Jail—the Court has no grounds for finding that Cook County inmates did not have access to the website during the class period. As a result, the Court agrees with the City that no reasonable jury could agree with the plaintiffs' assertions that they did not have access to the CPD website while incarcerated.[3]

---

[3] The plaintiffs also introduce a new theory of liability in their response to the City's motion for summary judgment in which they claim that it is irrelevant whether the plaintiffs had access to the website because the Cook County Sheriff's prisoner handbook wrongly stated that inmate property was held for 90 days at the jail property office. Pls.' Mem. in Opp'n to Def.'s Mot. for Summ. J. 14. The plaintiffs here appear to be conflating multiple municipal agencies and policies. The handbook, titled "Cook County Department of Corrections Rules and Regulations for Detainees," has no bearing on CPD or ERPS policy. Pls.' Local Rule 56.1(b) Statement Ex. 25.

That leaves the third and final issue relating to the CPD website, which is whether the City has sufficiently established that the webpage was active throughout the class period. The City presents two key pieces of evidence to that end. First, it refers to a screenshot of the website used in the deposition of Michael J. Mealer that took place on June 13, 2013, in a separate but factually similar case *Elizarri v. Sheriff of Cook County et al*, No. 07 CV 02427; City's Statement Ex. F; Pls.' Mem. in Opp'n to Def.'s Mot. for Summ. J. 10. During the deposition, Mr. Mealer, then the Commander of the Evidence and Recovered Property Section, confirmed that the screenshot was available on the CPD website "as we sit here today." *Id.* 11. Although that response suggests that the webpage was active for the last 6 months of the class period (June 2013-December 2013), the plaintiffs rightly argue that the screenshot cannot, in and of itself, substantiate a conclusion that the website was active between December 2011 and June 2013. Aware of that deficiency, the City's second key piece of evidence is a declaration from Mr. Mealer confirming that the screenshot used in the prior deposition was an accurate representation of the CPD website for the entirety of the class period. City's Statement Ex. B ¶¶ 13-14.

In response, the plaintiffs contend that the City has not sufficiently authenticated Mr. Mealer's deposition from the *Elizarri* case. Relying on *Specht v. Google Inc.*, the plaintiffs claim that Mr. Mealer's memory alone is not enough to demonstrate that the webpage was active during the class period. 747 F.3d 929, 933 (7th Cir. 2014) (concluding that authentication of website screenshots required "more than memory, which is fallible"). That case is easily distinguished from the present case, however, because the screenshots in *Specht* were retrieved using a third-

---

The property held at the jail property office is comprised of the personal items that are allowed to accompany inmates to the jail, such as keys and ID cards—not the other items that stay behind in the possession of the CPD. The plaintiffs' claim with respect to the handbook is thus wholly irrelevant to the current case.

party internet archive service. In fact, the plaintiffs' reliance on *Specht* is just as misleading as their previous citations to Mr. Mueller's and Mr. Conyers's deposition testimonies, as the full quote once again paints a much different picture: "But the district court reasonably required more than memory, which is fallible; it required authentication by someone with personal knowledge of reliability of the archive service from which the screenshots were retrieved. *See United States v. Bansal*, 663 F.3d 634, 667–68 (3d Cir. 2011) (screenshots from internet archive authenticated via testimony of witness with personal knowledge of how internet archive works)." *Specht* 747 F.3d at 933. Here, there is no analogous archive service. Instead, there is contemporaneous deposition testimony from Mr. Mealer indicating that the webpage was active as of June 2013, as well as a subsequent declaration specifying that that very same screenshot showed the contents of the website throughout the class period. The Seventh Circuit's finding in *Specht* is thus irrelevant to the current case, in which the plaintiffs have not otherwise challenged the legitimacy of the screenshot. Because the plaintiffs provide no evidence of their own that the screenshot was not posted for the entirety of the class period, the Court has no basis for ruling against the City in that regard.

In summary, the plaintiffs have failed to demonstrate that there is a genuine dispute of material fact with respect to any of the three website issues. The Court finds that the content of the website provided sufficient notice of the property return procedures, that Cook County Jail inmates had access to the internet during the class period, and that the webpage was active and online during that same period.[4] Because the plaintiffs have failed to establish any genuine dispute of fact

---

[4] The City also touts its statistical analysis indicating that 76.5% of property inventories were successfully returned to inmates during the class period, and that after the notice was amended to explicitly refer to both monetary and non-monetary property, the rate "only" increased to 79.7% and 81.6% in 2014 and 2015, respectively, before dropping again to 78.8% in 2016. City's MSJ 10. Although the Court need not rely on these figures in granting summary judgment

in regards to these three issues,[5] the Court finds that the City has sufficiently shown that it provided the plaintiffs with notice of its property disposal policy, and in turn satisfied its due process requirements.[6]

This conclusion leads inexorably to denial of the plaintiffs' motion for summary judgment, which is premised on the argument that the City was required to provide individualized notice and a hearing before depriving them of their property.[7] Because due process does not require

---

for the City, the Court cautions the City from drawing faulty statistical conclusions about the "mere 3.2 percent difference" between the rate in 2014 and that in 2015. To begin, the percentage difference between the pre-amendment rate of property return and the post-amendment rate is not 3.2% (which is the difference between the rates themselves) but 4.2% (3.2%/76.5%). More important, considering that the CPD created 233,339 personal property inventories during the class period, a percentage difference of more than 4% with a sample of that magnitude is assuredly statistically significant—meaning that it is highly unlikely that the difference is due to chance. The positive correlation between the amendment to the notice and the rate of property returns therefore actually cuts against the City's argument by suggesting that the change in notice may have had a notable effect on property return rates. The usefulness of the City's metric is also questionable in any event both because the data do not separate out incarcerated individuals from those who were released prior to the expiration of the 30-day window and because the correlation does not control for the possible effects of any other potentially confounding variables, such other changes in implementation of the policy, a year-to-year change in the share of inmates with inventoried property being released from the Jail within 30 days, or any number of other unaccounted factors.

[5] The plaintiffs also argue that the CPD policy is an outlier when compared to similar policies maintained by other police departments around the country. While those comparisons are not wholly irrelevant, the key question in the analysis remains whether the CPD's policy passes constitutional muster—and the Court has determined that it does.

[6] The parties dedicate significant portions of their briefs to debating whether the plaintiffs' claim should be considered an express policy claim or widespread custom or practice claim under § 1983, and in turn whether they are required to show deliberate indifference. Because the Court has granted summary judgment for the City on the basis of the website's content and availability, it need not resolve this difference of opinion.

[7] The plaintiffs also repeat, albeit very briefly, the argument that they put forth in the motion to dismiss briefing that the City's policy "does not follow state law." Pls.' Mem. in Support of Mot. for Partial Summ. J. 3. According to the plaintiffs, Section 720.25(h) of Illinois law requires the City to return all property to an arrestee upon release, discharge, or transfer to custody of the Sheriff of Cook County. As the Court explained in its second motion to dismiss opinion, however, the plaintiffs have misread the law:

> As the City points out, Section 720.25(h) of the Illinois Administrative Code states that "The Chief of police shall determine what personal property, if any, a detainee

13

individualized notice of state law remedies that are set forth in materials generally available to the public, *City of W. Covina v. Perkins*, 525 U.S. 234, 241 (1999), and because the Court finds that the undisputed facts establish that the City's procedures for obtaining the return of property seized at the time of arrest were generally available to those transported to the Cook County Jail following arrest, no individual notice was required. The plaintiffs argue that they are entitled to summary judgment because none of the named plaintiffs or class representatives actually received either the Notice or the Copy 4 when their property was inventoried. But in light of the Court's finding above that the City's policy satisfied due process because of its availability to inmates at the Jail, the failure to provide individualized notice does not violate due process.

Further, even if the City's procedure for obtaining the return of seized property had not been generally available, the plaintiffs due process claim against the City would still fail because the plaintiffs have not shown that the City's alleged failure to provide the Notice and Copy 4 on a handful of occasions, in the face of an explicit policy to the contrary, constitutes a violation of due process.[8]

In general, local governments can be held liable for injuries committed solely by their employees only when the injuries are the result of the "execution of a government's policy or

---

may retain." Defs.' Reply at 6. Further undermining the plaintiffs' argument is that the same provision goes on to state return of an inmate's property is only required upon "release," which includes "parole, mandatory supervised release, discharge[], or pardon[]." Ill. Admin. Code, Title 20 § 470.20. Of course, this makes sense because an arrestee who is in custody has no right while in custody to retain with them the personal property that was in their possession at the time of arrest.

Mem. Op. and Order 13 n.11, ECF No. 95.

[8] The plaintiffs also put forth the same arguments in their motion for partial summary judgment relating to the evidentiary foundation of the CPD website that they relied upon in their opposition to the City's motion for summary judgment. As explained above, those arguments are unpersuasive.

custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury. . ." *Monell v. Dep't of Soc. Services of City of New York*, 436 U.S. 658, 694 (1978). The Seventh Circuit has expanded upon *Monell* and required plaintiffs to show that the constitutional deprivation resulted from "(1) an express policy that, when enforced, causes a constitutional deprivation; (2) a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a "custom or usage" with the force of law; or (3) an allegation that the constitutional injury was caused by a person with final policymaking authority*." McTigue v. City of Chicago*, 60 F.3d 381, 382 (7th Cir. 1995) (cleaned up).

The plaintiffs have not made an adequate showing of any of the three types of *Monell* deprivations. To the contrary, the FAC admits that the City maintained an "explicit policy" during the class period of providing incarcerated individuals with the Notice. FAC ¶ 15. If even the plaintiffs acknowledge the existence of the policy, then allegations of sporadic violations of that policy, even if true, do not constitute the types of violations for which the City could be held liable under *Monell*. *See Parratt v. Taylor*, 451 U.S. 527, 543 (1981) ("[T]he respondent has not alleged a violation of the Due Process Clause of the Fourteenth Amendment. Although he has been deprived of property under color of state law, the deprivation did not occur as a result of some established state procedure. Indeed, the deprivation occurred as a result of the unauthorized failure of agents of the State to follow established state procedure."). Here, the City's alleged failure to provide the plaintiffs and class members with the Notice or Copy 4 represents the type of "unauthorized failure" described in *Parratt*.[9] In sum, even if the plaintiffs did not receive the

---

[9] A conclusion buttressed by the City's report that more than 75% of inventories in the class period resulted in individuals reclaiming their personal items. *See supra* note 4. Although the

Notice or Copy 4, they have done nothing to establish how that deficiency implicates the City in a violation of their right to due process.[10]

The plaintiffs also briefly allude to the fact that the City did not "provide[] plaintiffs with a hearing before the destruction of their property." Pls.' Mem. in Support of Mot. for Partial Summ. J. 3. They do nothing to explain on what grounds the City was required to offer such hearings under the Due Process Clause. On that basis alone, the Court could deny this aspect of the plaintiffs' motion. But even assuming, arguendo, that the City was required to offer hearings of some kind, the plaintiffs also fail to show that the procedures in place during the class period did not satisfy due process hearing requirements. The Supreme Court "consistently has held that some kind of hearing is required at some time before a person is finally deprived of his property interests." *Memphis Light, Gas & Water Div. v. Craft*, 436 U.S. 1, 16 (1978) (cleaned up). There is no uniform rule for what such a hearing must entail, but instead it must only be "appropriate to the nature of the case." *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 313 (1950). A hearing that consists of the "opportunity for informal consultation with designated personnel empowered to correct a mistaken determination" might constitute a "due process hearing" if the relevant individuals are provided noticed containing information on "where, during which hours of the day, and before whom" they may contest a deprivation. *Memphis Light, Gas & Water Div.* 436 U.S. at 16, n.17, 14, n.15.

---

figure is relatively imprecise, it nonetheless suggests that City employees were, for the most part, adhering to the explicit policy of providing individuals with the Notice and Copy 4.

[10] The plaintiffs dedicate the bulk of their reply brief to delving into the minutia of the City's responses to their Statement of Facts. Pls.' Reply Mem. in Support of Mot. for Partial Summ. J., ECF No. 195. In doing so, the plaintiffs seemingly aim to establish that they truly did not receive copies of either form. Nowhere do they attempt, in any meaningful way, to establish that not receiving the forms constitutes a colorable violation under *Monell*.

Here, the plaintiffs have not even attempted to prove that the City's procedures were inadequate. The City's policy dictated that inmate property was to remain claimable for thirty days, and the Notice included the business hours and telephone number of the ERPS, as well as the instructions to access the CPD website where additional information was located. These features of the City's policy are sufficient to overcome the plaintiffs' claims with respect to pre-deprivation hearings, especially considering the wholly inadequate nature of the plaintiffs' argument.

In short, the plaintiffs' motion does not meet its burden to show that a reasonable jury could only rule in their favor. Their claims with respect to the alleged lack of both individualized notice and pre-deprivation hearings are unpersuasive. Because the City has established that it provided constitutionally adequate notice to putative class members, the Court grants the City's motion for summary judgment and denies the plaintiffs' motion for summary judgment on the plaintiffs' due process claim.

### II. Plaintiffs' Motion for Reconsideration

As detailed above, the Court previously granted the City's motion to dismiss the plaintiffs' claim that the City's disposal of their personal property amounted to an unlawful taking in violation of the Fifth Amendment. Relying on *Williamson Cnty. Reg'l Planning Comm'n v. Hamilton Bank of Johnson City*, 473 U.S. 172 (1985), the Court held that the plaintiffs could not maintain an as-applied Fifth Amendment takings claim until they had pursued all available state court remedies. Mem. Op. and Order 5-11, ECF No. 95. In *Williamson County*, the Supreme Court held that "if a State provides an adequate procedure for seeking just compensation, the property owner cannot claim a violation of the [Takings] Clause until it has used the procedure and been denied just compensation." 473 U.S. at 195.

In *Knick v. Township of Scott, Pennsylvania*, however, the Supreme Court overruled *Williamson County* and held that a takings claim is ripe "as soon as a government takes [one's] property for public use without paying for it." 139 S. Ct. 2162, 2170 (2019). Shortly after *Knick* was decided, the plaintiffs filed a motion asking the Court to reconsider its dismissal of the plaintiffs' taking claim, as that ruling had been predicated on *Williamson County*'s now-invalid state-remedy exhaustion requirement.

In response, the City does not dispute that the premise of the Court's dismissal of the plaintiffs' takings claim has been invalidated by *Knick*. The City argues that the dismissal should nevertheless stand, however, because the City did not take the plaintiffs' property "for public use" but rather pursuant to the City's police powers; "no compensable Fifth Amendment Takings claim," the City maintains, can be brought against the government if the property at issue is lawfully seized through the exercise of governmental authority other than the power of eminent domain." City's Response to Pls.' Mot. to Reconsider 8, ECF No. 207. In the City's view, because the CPD was exercising its lawful police powers in seizing the plaintiffs' personal property when they were arrested, there was not a compensable taking under the Fifth Amendment. "Property seized and retained pursuant to the police power is not taken for a 'public use' in the context of the Takings Clause." *AmeriSource Corp. v. United States*, 525 F.3d 1149, 1153 (Fed. Cir. 2008).

The City's argument that in the context of the seizure, retention, and disposal of arrestee personal property there is no taking for "public use" might be, in the Court's view, correct, though not for the reasons stated by the City. As the Court sees it, the City's argument misunderstands when the "taking" at issue occurred. The plaintiffs do not contend that the City violated the Takings Clause by collecting their personal property at the time of arrest; they acknowledge that police may take possession of such property incident to lawful arrests. Pls.' Reply in Support of Mot. to

Reconsider 2, ECF No. 208 ("Plaintiffs do not dispute that the power to seize and inventory arrestee property is within a municipality's police powers."). Rather, the plaintiffs allege that the unlawful taking in this case occurred when the City destroyed their personal property rather than return it. That action, the plaintiffs maintain, "is not a valid exercise of police powers because it fails to 'promote the public health, the public morals or the public safety.'" *Id.* (quoting *Chicago B&Q Ry. Co. v. Illinois ex rel. Grimwood*, 200 U.S. 561, 592-93 (1906)). The plaintiffs submit that the Court should reject the City's police powers argument "because defendant's sale or destruction of arrestee property has nothing to do with police powers." Pls.' Reply in Support of Mot. to Reconsider 2.

The Court agrees. The disposal of personal property seized from arrestees is not an action that has any discernible connection to the exercise of the State's police powers. At issue is not the retention and/or disposal of contraband, evidence, or instrumentalities of crime, but rather of items that were taken solely because detainees are not permitted to retain personal property while they are in custody. That rationale, the Court will assume, would insulate police from a takings claim premised on the seizure and retention of personal property while an arrestee remains in custody. But what is at issue here is not the initial taking and retention of personal property, but rather the disposal—i.e., the permanent deprivation of that property—by the police. No state "police power" justifies the act of permanently depriving arrestees of their personal property seized at the time of arrest when the state has no ongoing interest in retaining or ensuring the disposal of the property. That is the case here; indeed, Illinois law requires police to return personal property to arrestees upon release. 20 ILCS 720.25(h). That policy scotches any notion that there is some state "police power" that justifies the failure to return personal property seized only because an individual was

arrested. Even if some such justification could be imagined, Illinois has disavowed any use of that power by requiring the return of such property to the arrestee upon release.

The cases on which the City relies for this proposition are all distinguishable on this basis— all involve the retention and/or disposition of property as to which the state has an ongoing interest consistent with the exercise of its police powers. *See Bennis v. Michigan*, 516 U.S. 442, 446 (1996) (upholding forfeiture of automobile in which husband committed crime as exercise of state police power to abate a nuisance; "an owner's interest in property may be forfeited by reason of the use to which the property is put"); *Kam-Almaz v. United States*, 682 F3d 1364 (Fed. Cir. 2012) (return of computer in non-working condition did not give rise to damages for loss of business resulting from lack of access to business files because computer had been seized as part of lawful investigation); *Tate v. District of Columbia*, 627 F.3d 904, 909 (2010) (impoundment and auction of auto for unpaid parking tickets effectively a forfeiture based on owner's unlawful conduct); *Seay v. United States*, 61 Fed. Cl. 32 (2004) (no taking where property was retained and damaged over course of criminal investigation and ultimately returned to owner); *Alde v. United States*, 28 Fed. Cl. 26, 34 (1993) (aircraft seized and held pending forfeiture proceedings); *Jarboe-Lackey Feedlots, Inc. v. United States*, 7 Cl Ct. 329 (1985) (seizure and non-return of meat unlawfully implanted with a prohibited drug not a taking). There is a fundamental difference between a police power seizure based on conduct that justifies forfeiture of all property rights to the seized property and one that offers no basis for such a forfeiture and allows for only a temporary deprivation of rights of possession with respect to the seized property. The City errs, in the Court's view, in arguing that all seizures pursuant to the state's police powers provide the City with unfettered license to destroy the property seized. Nothing in *Bennis* or the other cases relied on by the City suggests that there can be no compensable taking when the state deprives a property owner of all

20

rights to property as to which the state has only temporary custody. To the contrary, saying that "the Takings Clause does not apply when property is retained or damaged as the result of the government's exercise of its authority pursuant to some power other than the power of eminent domain," *Johnson v. Manitowoc Cty.*, 635 F.3d 331, 336 (7th Cir. 2011), acknowledges that the scope of the Takings Clause extends to situations in which property is retained or damaged by the state when—as here—it is ***not*** exercising its police powers.

For that reason, the Court agrees with the plaintiffs that the destruction of their personal property by the state is not justified as an exercise of the state's police power, even if the initial seizure and retention of that property was. The destruction of that property was itself a taking of the plaintiffs' property independent of the first taking, which was the seizure pursuant to the state's police powers.

Nevertheless, the plaintiffs have done no work to establish whether the destruction of arrestee personal property constitutes a taking for "public use." A taking for public use is, as construed by the Supreme Court, a taking that serves a "public purpose." *Kelo v. City of New London, Conn.*, 545 U.S. 469, 480 (2005). And while the Court does not agree with the City's view that the disposal of the plaintiffs' property constituted an exercise of the state's police powers, for the plaintiffs to succeed on their motion, they must demonstrate a public purpose for the destruction of their property. The plaintiffs suggest no public purpose for the second taking (*i.e.,* the destruction) of their personal property in their filings nor do they allege any in the operative complaint,[11] which simply alleges that the City's policy is to treat as abandoned and destroy any

---

[11] The City's destruction of the plaintiffs' property might be characterized, at least in some cases, as a form of escheatment, but that would not establish a taking for "public use." Escheat laws—like the City's policy of destroying the unclaimed property of arrestees after 30 days—are premised on the abandonment of property, *Delaware v. New York*, 507 U.S. 490, 497, 113 S. Ct. 1550, 1555, 123 L. Ed. 2d 211 (1993). As such, they are not "takings" subject to the Takings

retained personal property of arrestees not claimed within 30 days of the inventory date. FAC ¶ 23. In fact, the phrase "public use" does not appear a single time in the plaintiffs' motion or reply. The plaintiffs, in short, have entirely ignored the public use element of a Takings claim. They have adduced no evidence and made no argument to show that their property was taken for a public use. As a result, they have not adequately shown that the City's policy violates the Taking Clause of the Fifth Amendment and their motion for reconsideration is denied.

### III. City's Motion to Exclude Opinion and Testimony

Because the Court has granted the City's motion for summary judgment, denied the plaintiffs' motion for partial summary judgment, and denied the plaintiffs' motion for reconsideration, the Court need not rule on the City's motion to exclude the opinion and testimony of the plaintiffs' expert witness. That motion is therefore denied without prejudice as moot.

\* \* \*

For the reasons stated above, the Court finds as a matter of law that the City's policies satisfied the notice and hearing requirements of the Due Process Clause of the Fourteenth Amendment. The City's motion for summary judgment, ECF No. 173, is therefore granted and the plaintiffs' motion for partial summary judgment, ECF No. 180, is therefore denied. The Court also finds that the plaintiffs have failed to show that the destruction of their property constituted a taking for public use under the Fifth Amendment, and thus their motion for reconsideration, ECF No. 201, is denied. Because of those rulings, the City's motion to exclude the opinion and testimony of the plaintiffs' expert witness, ECF No. 176, is denied as moot. Judgment will be entered for the

---

Clause. *Temple-Inland, Inc. v. Cook*, 192 F. Supp. 3d 527, 551 (D. Del. 2016) ("A holder generally has no property interest in abandoned property. . . Thus, there is no unlawful taking when a state seeks to escheat abandoned property.").

City and against the plaintiffs and all members of the certified Class who did not timely opt out of the Class.[12]

Date: May 18, 2020

John J. Tharp, Jr.
United States District Judge

---

[12] Plaintiffs' counsel are directed to submit a list of any Class members who filed a timely opt-out election to the Court's proposed order inbox within 7 days of the entry of this Opinion.